Good morning, Your Honors, and may it please the Court, Kathleen Sullivan for Motorola. We respectfully request that you reverse the judgment below, because no reasonable jury could find breach of the implied covenant of good faith based merely on two opening offer letters and the request for injunctions, nor could, as a matter of law, the jury find damages where the damages here were all predicated on protected litigation conduct protected by Norr Pennington. Counsel, ordinarily, if you feel that there's no evidence at all, you bring a motion. But no motion was brought here. That is, this is an issue that could have been brought before the district court by a motion. Oh, it was, Your Honor, both on 50A and 50B, and it was denied. We did argue for the insufficiency of evidence on 50A and 50B. What we're appealing, actually, we're asking you to reverse the denial of the JMOL. But, Your Honors, I want to be clear that we have a second request, if you don't agree with me, on reversal of the denial of the JMOL. And our alternative request is that you grant a new trial, because we believe that the RAND order produced by the bench trial was improper and then was improperly introduced into the jury trial in a way that effectively precluded Motorola from having a fair jury trial on breach and effectively directed a verdict for Microsoft. If I could begin, Your Honors, with the breach point. We think that no reasonable jury could find legally sufficient evidence here for a breach of a contract of good faith, because the only thing at stake in the case was two opening offer letters from October of 2010. And it's undisputed now, as a matter of law, that opening offer letters need not be RAND. In fact, the district court so held at ER 17879. And no Washington case has ever found, ever found, nor have we found any from any other jurisdiction, that finds that a mere opening offer letter to begin a process of bilateral negotiation can constitute a breach of good faith. Now, I... Isn't this a holistic question, though, i.e., whether the overall course of conduct... Correct, Your Honor. ...evidenced a breach of the duty of good faith and fair judgment? That's right, Your Honor. So let me just... Of which the opening offer would have been a part, but the judge was clear, and I believe instructed the jury, that it wasn't itself enough by itself. Correct, Your Honor. The judge was clear. And Microsoft's syllogism here is, well, you had opening offer letters that were blatantly unreasonable, then you sought injunctions, and both of those were permitted. In other words, the opening offer letters need not... Also the set of issues around the Marvell, the exclusion of Microsoft from the Marvell negotiations as well. Yeah. All true, Your Honor. But what I'd like to focus on is simply that you can't put two permissible activities together and create an impermissible activity. Your position is that no matter how high the opening offer is, it could not be bad faith? Not in itself, Your Honor. Not in itself. Not in itself. Not in itself, Your Honor. So the question, as Judge Berzon correctly asked, is did the course of conduct amount to good faith? And in a nutshell, our argument is even the course of conduct added together can't be a violation of good faith, because as a matter of law, seeking injunctions is not a violation of the RAND commitment. We know that now, since we were here last... Oh, no, that's backwards. It's not a violation as a matter of law. It's different from as a matter of law, it's not a violation. Correct, Your Honor. But we know now from the Apple v. Motorola decision of the Federal Circuit that any view that injunctions are categorically impermissible here is error. Correct. And they were specifically instructed that it wasn't categorically impermissible. That's correct, Your Honor. So there's nothing here, there's no case for good faith based on permissible offer letters plus permissible injunction requests taken together in this record. But you're assuming that it was a permissible injunction request as opposed to the fact that it wasn't impermissible as a matter of law. Your Honor, the reason why it wasn't impermissible here is that the course of conduct in context began with Microsoft suing Motorola and saying put your patents on the table, which we did, upon which they didn't make any counteroffer, they simply sued. So, Your Honor, our position is you can't take the record here, given that as a matter of law, the opening offer letters need not be RAND in themselves, injunctions are permissible, and in the course of conduct here, Microsoft initiated, said put your patents on the table, which was response to the October letters with any counteroffer. In that context, we think it's an insufficient case of good faith. But, Your Honor, let me proceed if I could. And if you look at nothing else, Your Honor, on why this was reasonable, remember the context is bilateral negotiations. And if you look at nothing else, look at pages ER 353 and 54, where Horacio Gutierrez, Microsoft's key executive witness, says I reject offers, I reject opening offers 99 percent of the time. So what was reasonable here about the context here was it was the opening of a bilateral negotiation from which we got no response whatsoever, when Microsoft rejects opening offers 99 percent of the time. So, Your Honor, I'm not making a legal argument. I'm making a factual argument. But, Your Honor, let me turn to damages. On damages, we think there is a purely legal reason for reversal, and that is that all of the damages in this case were based on protected litigation conduct. $11 million is for having to move the German facilities in response to the German suits, and $3 million is attorney's fees. So we think it runs squarely, the damages ruling here runs squarely into Norr Pennington. All of the damages had to do with the injunction. None of them had to do directly with the offer, right? I'm sorry, with the offer? Yeah. In other words, the measure of damages had directly to do with the injunction. That's absolutely correct, Your Honor. And that's a very important point. We think that we're not arguing that Norr Pennington precludes breach of contract suits for RAND commitments, and we're not arguing that Norr Pennington precludes all damages whatsoever for breach of contract of RAND commitments. We're arguing that Norr Pennington precludes these damages for violation of the RAND commitment or breach of the RAND commitment. Tell me why that is. Because all the damages here are the result of Microsoft responding either by hiring attorneys or moving its facility to Motorola's protected litigation conduct. And we think you should make clear if there's any doubt that Norr Pennington applies to foreign suits. The Northern District is already so held, so is the Fifth Circuit. So, Your Honor, every single piece of the damages here flows directly from Motorola's lawsuits. That's why. There might be a different case. You could imagine a case where a ---- But, I mean, there is a range of circumstances in which damages can flow, proper tort damages or tort-like damages can flow from the filing of a lawsuit, including malicious prosecution, breach of duty of representation. There are bankruptcy instances. There's a number of ---- there's the BEA and K case and the NLRB case. I mean, there are a number of instances in which filing a lawsuit itself can be wrongful and give rise to damages. Yes, Your Honor, there is. With that regard to Norr Pennington. Yes, Your Honor, there is. Those are exceptions to the American rule and equitable exceptions to State law bans. But you're not arguing here the American rule right now. We're arguing that as well. Right now I'm on Norr Pennington. You're talking Norr Pennington right now. And here's the key, Your Honor. That may be true where the lawsuit shouldn't have been brought. But we know from Apple v. Motorola, the Federal Circuit's decision, we know from page 1331 that there's no rule against seeking injunctive relief based on a RAND commitment. So this can't be one of the cases where we're precluded. But they ultimately said they said there's no blanket rule against it. They didn't say there was no set of instances in which it was improper. But, Your Honor, there is a blanket rule against getting damages for protected litigation conduct. The only way you get out of the protected litigation conduct is if it isn't protected. Now, it certainly wasn't sham litigation. We won in Germany. And it certainly wasn't malicious prosecution or any other category of litigation that wasn't protected. The Federal Circuit has said it's protected. We might lose on it. We might be denied. We might, in fact, they might even seek attorney's fees in a patent infringement action. But they can't come after us and say we get contract damages for you bringing a protected lawsuit. That's our argument. And, Your Honor, if you don't buy Norr Pennington, at least for the attorney's fees, we'd argue that Washington law precludes the grant of damages for the consequences of litigation because it's, in effect, an exception to the American rule. The district court predicted that Washington would adopt an exception for breach of RAND commitments, but we don't think there's any basis to suppose Washington would, since all the other courts who have considered, including this Court interpreting Oregon law, have held that there is not an exception for breaches of a covenant not to sue. And as I've repeated a couple of times now, we don't think the RAND commitment is a covenant not to sue. Do you suggest that we ask the Washington Supreme Court what the law of Washington means? You could, Your Honor. You could certify. We don't think you need to because we think that the majority rule is clear, and that just goes to the attorney's fees, but that would be an option. We think Norr Pennington takes care of all the damages. If you have a question about Washington law, you could, of course, certify. I mean, in addition to the other issue, i.e., the covenant not to sue issue, this is not what one ordinarily thinks of as an attorney's fee award. It is a damages award in this case for something that happened elsewhere, and the question is whether that is an appropriate measure of damages for that other injury. Correct, Your Honor. So I don't even quite see why the American rule question arises as such. I mean, the question is, is this an appropriate measure of damages? But you're not trying to – no one's trying to get damages for the fees for the work in this case. In effect, they are, Your Honor. It's just doing it in two different lawsuits. If they brought a fee request – remember, Motorola has pending patent infringement actions against Microsoft. Microsoft continues to infringe our patents and has never paid a dime for them. So there are still pending infringement litigations. Had they said, excuse me, give us fees in our infringement litigations, that would have been a request for attorney's fees there. Instead, they came and they sought fees in a separate case. So, Your Honor, we think you can reverse the damages. We think you should reverse the judgment because there was no breach or the JML should have been granted on no breach. But at a minimum, we think you should reverse the damages. But I'd like to return, if I may, a turn, if I may, to the alternative argument, which is, at a minimum, you should send this back for a new trial. Because what happened that you – none of us could have predicted when we were last here in this courtroom. What happened in the meantime is that the district court bifurcated the case in two and held a bench trial at which the district court determined a RAND rate and range and numerous other findings about the value of Motorola's standard essential patents. And then there was separately a jury trial. And we think that there are three problems here. First, the RAND order itself was improper in that it departed from governing Federal Circuit law on patent damages and even from this Circuit's law on speculative damages. Second, the case – the bifurcation was improper. And third, the introduction of the RAND order findings into the jury trial was improper. And let me try to lay those out, if I could, one at a time. Would you also, while you're doing that, cover whether or not your opposition is correct that you – that Motorola actually requested the separate RAND trial and there was no objection in the district court? I'm happy to start with that, Your Honor, because I think that once we dispel that, the rest follows. I don't think there's ever been a supposed waiver on as thin a read as in this case, a waiver of a jury trial right. Actually, it seemed to me to be fairly explicit. And the question is, what did it cover? Fair enough, Your Honor. So the whole argument boils down to S.E.R. 7475 and a single stray comment of Motorola's counsel in a Markman hearing in the patent docket, not even this case, in which the sum total of the supposed concession is from Motorola's counsel, bottom of S.E.R. 74 up to 75 is our agreement is that the court would decide all the material terms of the RAND license, and we currently have a disagreement with respect to whether the breach of contract action would be tried by the court or by a jury. Now, what happens later is when we were last here, you contemplated, this Court contemplated that perhaps the Court would create a license. The Court later decided not to create a license. The Court recognized that a license has many terms, and the Court focused only on the price term of the license and had a RAND rate trial. That's what that's – and there was never any pleading requesting a license, there was never any amendment of the pleading requesting a license, and there was never a grant of any license. So, Your Honor, the thing addressed in that comment was something that never eventuated in the trial, a license. And if I could refer you just to all the facts that refute – But if you look at the minute entry of the status conference that was held subsequent to the Markman hearing, they talk about the scheduling order, and then it concludes with, in the event the parties agree to a bench trial for the breach of contract issue, the contract – the Court may adjust the length of the trial accordingly. So it seems pretty clear at that status conference that both parties anticipated a RAND hearing and bench trial. Well, Your Honor, Motorola did not consent to the bifurcated procedure and never consented to the jury being instructed on the RAND rate. I mean, let me tell you how I read it. I read it as saying that they did specifically consent to that and never actually reneged on it, because when they came back a month or so later and said, well, we're having a problem, the problem they were having was a substantive problem, but they were continuing to argue whether the judge could do this at all, not whether he could do it in a bifurcated trial. My issue is whether what – as I say, what it covered. Did it cover more than simply – it seems to me your strongest point is that it didn't cover the findings. It didn't cover the findings. Or did it cover the findings? That seems to be the important question, because it seems pretty explicit as to covering the RAND amount. Your Honor, there was never a consent to the findings, and there was never a consent to the introduction of the findings into the jury breach trial. There was never a consent to the bench trial findings being part of the instructions to the jury in the breach trial. And there was a consistent request for a jury trial on breach. So you get to the place with whether or not it's going to be a harm to your client. And I noticed that the – it's not binding on us, but the Federal Circuit apparently now thinks the district judge did a very fine job in his RAND approach and so said in Erickson. Your Honor, with respect, the Federal Circuit did not say anything substantive. It simply described the case in the Erickson footnote. And importantly, what – if Erickson means anything for this case, it means that the Federal Circuit has clarified that it thinks analysis of the value of RAND-encumbered SEPs is a matter of Federal Circuit patent law, which is why we requested a transfer of jurisdiction. Chief Judge Thomas, I'm concerned that I'd like to reserve time for rebuttal. Certainly. I'll give you 10 minutes for rebuttal, and we'll increase the time. Okay. Thank you. So may I continue here just to finish? Yes. Thank you. Thank you, Your Honor. I appreciate it very much. I do think the threshold question is consent, and I'd like to point the Court to just a few data points that show why we did not consent to the scope Microsoft claims. We did not consent to a bench trial finding on rate being introduced into a jury trial, and we certainly never consented to any determination by the bench of facts beyond the rate. And I'll – there are many facts beyond the rate that get introduced as determinative findings into the jury trial. Well, I think it's fair to say, just so we set this aside, that, one, there is a least implied consent to the bench trial itself in the format, and, two, you didn't raise a Seventh Amendment issue with respect to the RAND portion of the trial. True? That's correct, Your Honor. And you didn't raise the issue that is contained in your brief about this was only an advisory opinion. Well, we did raise that, Your Honor. We brought a – we brought – just to go through the chronology in the summer of 2012. Remember, in the summer of 2012, first there's that stray remark in the Markman hearing. We think the Court should set the terms of the license. Then there is a telephone conference in July where we object to the Court setting the terms of the license, and we object to the Court setting – sorry, instructing the jury on the proper RAND rate. That's in the same colloquy at SER 64 that I just read to you. And then in July of 2012, there's our summary judgment motion in which we – I don't see the advisory – Opinion part – Language in there. I also don't understand the advisory opinion part. Perhaps you could explain it. Yes. I mean, obviously, if – I mean, or put another way, isn't it the same as the jury trial, as the introduction to the jury trial? Because obviously, if it was introduced in the jury trial, it wasn't advisory. So what's the advisory argument? Your Honor, the advisory argument is if the judge – there's no controversy between the parties over the proper RAND rate. Of course there wasn't. In the abstract. No, no, no. Microsoft didn't seek a license or specific performance. This is a case about breach of contract. They're suing us for damages because we supposedly cost them money by bringing our protected litigations. So, Your Honor, there's no – this isn't a patent case in which the parties are joined on how much damages should Motorola get. But the judge explained that there was no way to determine the good-faith issue without knowing the RAND rate. Now, that could be right or it could be wrong, but it's not advisory. Well, Your Honor, it's wrong. Let me say why. And this goes back to the error in the bifurcation. Your Honor, the judge did determine, the trial court did determine that it was necessary, his word, to determine the true RAND rate before the fact finder, here the jury, could find whether there had been a breach. There's no basis in Washington or any other state's law for that assumption. That is, there has never been a case that we're aware of or that Microsoft decided where there had to be a determination of a true price term before you could decide whether a bilateral negotiation was initiated or even conducted in good faith. And so that fundamental premise violates state law, the notion that it was necessary to determine the price term. It might have been relevant. And, Your Honor, just to cut to my bottom line, our position is the way this should have been tried is a single fact finder should have been able to hear all of the arguments together.  arguments together. And at the end of the day, the fact finder should have been able to hear all of the Well, Your Honor, if that was at the point when we were laboring under the impression that we were going to ‑‑ there was going to be a license. That disappears from the case. But you're right, Your Honor. There was active discussion about what the judge would set. But the order in which things happened here creates a problem. And here's the problem. Once the district court sets the so-called true RAND rate, and that becomes a set of unarguable conclusions that are introduced into the jury trial, it biased the jury trial and effectively directed a verdict for Microsoft. It created a situation in which Motorola couldn't, even with all the other evidence of subjective good faith, reasonable industry practice, reference to Microsoft's own practice of rejecting opening offers and engaging in bilateral negotiations, evidence that Microsoft sends out letters with a 20‑day sunset period. If the jury is told the rate is a minuscule fraction of the number in the opening offer letter, and there's no ability to contest that or cross‑examine it. I mean, the fact that this could and would have gone to a jury had there not been an agreement really isn't the question. In other words, your argument is that this was an integral part of the ultimate decision, and it was. But nonetheless, the question is, and would you have had a Seventh Amendment right to a jury trial on it? It would appear that you would have. But you're not even making a Seventh Amendment argument, as I understand it, with regard to the first part of it. Exactly. Your Honor, we're making a Seventh Amendment argument with respect to the introduction of the RAND findings into the jury trial. So let me ‑‑ actually, let me say, the Seventh Amendment argument is that the RAND findings effectively directed the result of the jury trial in a way that we didn't consent to, because the scope of our consent was far more limited than the district court interpreted it to be. But forget about the Seventh Amendment, and forget about Article III. We should have been under federal rule of evidence 403, because the introduction of the RAND order came in as if it was an expert opinion that couldn't be dowarded, couldn't be crossed, and couldn't be subject to any objections. And if you look at ‑‑ I've asked you to look at a page in the record where there's one of Microsoft's concessions. I think a very illustrative page for you to look at in the record is ER 384, where you'll see how the RAND findings come into the jury trial. They come in as undisputed findings of fact. We had argument about it. The judge issued an order. But when they come in, and you look at how they come in, they come in as findings that we can't contest, as facts that we can't contest, as opinions we can't contest. Error witnesses are not allowed to bring in any evidence of historical licenses. Error witnesses are not allowed to explain any of their actions in light of the findings. But I guess what you're asking for today is you want all of the evidence that came in at the bench trial to be presented to the jury. Yes, Your Honor. And for the jury to determine a RAND rate? Your Honor, there's no need for the jury to determine a RAND rate, because it's not a license case. It's a breach of contract case. All the jury needs to determine is should Motorola be smacked with $15 million worth of damages because it had the audacity to stand on its patent rights and bring a set of suits it was entitled to bring, in jurisdictions it was entitled to bring them, and because it sent an offer letter to which Microsoft didn't respond. This isn't a case in which Microsoft came to the court and sought specific performance in the form of a license. It's still not in the pleadings. There still hasn't been an amendment. And so, Your Honor, that was just not what the case was about. Microsoft did offer repeatedly, as I understand it, to enter into a license at the RAND rate. Not repeatedly, Your Honor. Not until the first offer is no sooner than September 2011. As of 2011 or so, right? Yes, Your Honor. And it's an offer. Even if you don't read that as implied into the complaint, which, you know, doesn't make a lot of sense out of the complaint if that isn't what they're saying.  After the German suit was filed. So, in other words, there's nothing in their pleadings that ever captures that point. But the key point, Your Honor, is that the RAND findings, the way they were introduced into the trial, created an unfair trial that warrants a new trial in which, let's just imagine the counterfactual. In a counterfactual world in which the experts come into the court before the jury, the jury can assess whether the final RAND rate that the experts opine to bears on the reasonableness of the opening offers. They don't have to just take as gospel that can't be crossed, that can't be doubted, that can't be objected to, findings that say what the rate was. And there's more, Your Honor. If you look at page ER-384. But as Judge Thomas was saying, the trial, I mean, the bench trial took, what, six days or something? The bench trial on the RAND rate. At least, Your Honor. At least. And my understanding was that the reason for the agreement not to try it to the jury is because nobody thought the jury could possibly understand it. So if it had gone to the jury, it would have been, you know, an enormous amount of time and incredibly obfuscating. Your Honor. That is not to say you didn't have a right to do it if you hadn't agreed to do otherwise, but the consequences are large. We didn't agree to the findings ever being introduced before the jury. We didn't agree to bifurcation. But, Your Honor, the jury is trying breach. They don't have to find what the true RAND rate is. There's a false premise that underlies the entire case. When you pull it out, the entire thread unravels. There was no requirement under Washington breach law. This is a State contract law case. There's no requirement that you find the true price in order to decide whether an opening offer in a bilateral negotiation is reasonable. But if the other side chose to try it that way, thinking that it was a pertinent fact, it might be hard to say it wasn't a pertinent fact. It might be a pertinent fact, but if the district court determines in a way that effectively becomes an uncrossable expert opinion in the jury trial that the true rate was a fraction of the opening offer, that biases the trial, the jury trial, in a way that practically directs a verdict of breach. Now, Your Honor, there are independent reasons why the RAND order ought to be vacated here. It's part of the 54B. And if I could just – they're covered in our brief, but if I could hit the highlights. Why don't – our questions have taken you over time. All right. Thank you, Your Honor. But we did read the brief. Thank you, Your Honor. Put 36 minutes on. Good morning, Your Honors. May it please the Court. I think I'm going to start with the last issue and then take them in the opposite order because it does seem to me that this case turns in large measure on precisely what Motorola consented to and what flows from that specific consent. I think the Court's actually quite familiar with this language and the context in which it arises. But Microsoft's counsel says specifically to the Court, the parties agree, there is no jury involved, there's no jury requirement with respect to the Court's determination of what is RAND. The response of Motorola's counsel is, that's right, Your Honor. And then he goes on with the, quote, offhand comment. Where I'm having trouble is how that gets you to the submission of the underlying findings of fact. I think the logic of that becomes, if you accept that you're going to put before the jury what the rate range is and what the actual RAND rate is, and you're going to say that that is effectively collateral estoppel, because I think that's all we're talking about. They litigated this for six days. They analyzed every aspect of it. The judge made extraordinarily extensive and explicit findings with respect to how he got to exactly those rates and those numbers. To allow the jury to come back in and for Motorola to challenge every one of the subsidiary findings that gets you to that RAND rate is effectively to say the RAND rate has no effect in the subsequent proceedings. The argument so far has been based upon whether Motorola consented. But even if they get past that issue, if I were the district judge, I would anticipate focusing upon objections made so I'd know what was wrong with it. What were the objections that were made by Motorola to this process? Well, after the fact. Not after the fact. Oh, at the time of it, they consented to it. They said specifically. Okay. Then later on, not after that. If you mean after that fact, fine. During the actual trial, when it happened... Oh, they didn't object to a single thing. They litigated this issue to the nines. No objections. No, no. None whatsoever. But in the trial before the jury, they objected. Yes, but not at the trial before the judge. Right. I mean, they went at that hammer and tong. Obviously, it was a six, seven-day jury trial. And I think it's worth sort of putting into context because the sort of after the fact point I was going to make is that when they finally get around to sort of complaining about the bifurcation process, Motorola's counsel specifically says, and this is in the supplemental appendix 65, there is no question it's late, this entire process of trying to go back on that. You're talking about the month later? Yes, the month later. It wasn't what he was really talking about. It was a substantive argument that there was, that the judge couldn't... Right. ...couldn't determine the RAND rate because it was a, essentially, there wasn't a contract because there weren't enough... Right. And in that process, they sort of make... It was a substantive objection. It wasn't about the waiver. Absolutely. I think that is, if you were going, I mean, the way this should have been done, if they really wanted to have litigated it properly, what they would have said is, we acknowledge that we waived our Seventh Amendment right because, clearly, the Seventh Amendment is embedded in that entire discussion of what they consented to because the other half of it is, they say specifically, we're going to save that for the jury pursuant to our Seventh Amendment rights. So this is all embodied in that. So what you should have done, if you were going to do anything, is come back a month later and say, we've changed our mind. We don't, we've decided we want to assert our Seventh Amendment right. They didn't do it then, and they haven't even done it today. Up to this day, they say, we never consented to this. If you set aside the consent, at some point, you're going to introduce a RAND rate. And I understand you had witnesses that introduced the RAND discussions and findings by the trial court. At that point, that's the first time the jury is going to hear it. Was there an objection made at that time by the, by Motorola? I do think there was an objection at the point in time. Well, there was a discussion about how to properly put it in, whether you would do it through, no, there wasn't an objection to it because the question was whether you would do it through a jury instruction before the trial or do it at the end of the trial by jury instruction or whether you would try to do it through the witnesses. But I thought if the strikes made it up until the point that you actually get it before the jury, they may have consented earlier, but the issue is coming up right then and the judge has to know there's a problem so the trial judge can handle it. They did not renew their objection at the point in time when the question was, are we going to put the RAND rate? You said renew the objection. What do you mean by renew? Well, they, again, after having consented, sort of raised an issue as to whether. . . Before or after the jury trial? That was before the jury trial. So the judge was on notice that there is a problem. That's their argument, that the judge knew that in general they weren't happy about this, although I will tell you candidly it was a very blurry objection. In every trial, a trial judge waits for the specific objection. I did that when I was a district court judge. So what I want to know is at the time the evidence is going to come in, what objection was made by Motorola? There was no objection at that point in time. I thought. . . Are you sure about that? I mean, I thought there was, and he said something like, I understand you don't want any of this and you'll have a continuing objection. Yeah, but I don't even know that that was in response to an objection. I mean, I think he was just making that comment in passing. But, you know, I don't. . . I mean, what I think the right answer here is, was there consent? Yes, there was consent. And then the question is, once you consent to allow the RAND rate and the RAND range to go into the case and be put before the jury because there's no other way to do it and you've tried all these issues, then it seems to me this is nothing different from collateral estoppel. And the fact that it gets inserted into and may have a dispositive effect, although the judge specifically instructed him, what I determined to be the RAND rate doesn't answer the question of whether or not there's been a breach of this particular contract. He specifically took that off the table and said, you know, it's just one of the various factors that you have to consider. The other argument that Ms. Sullivan makes about the nature of what was before the court is, remember, we asked for an accounting and we asked for a declaration of the RAND rate. So they've known from day one that it was Microsoft's desire to get out of this litigation a RAND rate. Now, it may not be that state law compels a district court to actually determine the RAND rate as part of that process, but we were certainly entitled to ask for it, and it's certainly within the discretion of the trial court how to proceed. And it seems to me that once you get past the point of consent, then all you're really talking about is bifurcation. Kagan. Is your position that there wasn't, I mean, at some points earlier in the transcript, it seems that there's an understanding that there isn't a Seventh Amendment right to have the RAND rate decided by a jury. Is that your position or that it was waived? No, no, it's that it was waived. I don't think anybody doubted that if they wanted to try it that way, and I think Judge Robart explained that in the post-trial analysis when he said, precisely I think what Judge Wallace talked about earlier, which is these are very complicated issues. It was going to be very difficult for the jury to sort it out. It made much more sense to try those issues separately in front of the judge and then take that information and put it in front of the jury and then let the jury decide the issues of good faith. Let's assume for sake of argument that at the time it was actually proposed during the trial, during the jury trial, that Motorola did make their objection. Let's assume that Motorola has that issue properly before us. Has anybody talked in any of the appellate courts about the proper way to do this? I mean, it's a very complicated issue of how you get this before a jury and how you handle it. Now, you have Erickson, which gives you some help, I suspect. I mean, the responsibility of that court is to make sort of everything is going to be the same everywhere. I thought it was a very bad idea to have a specialty court. I never did like the idea. But I understand the purpose of it. Is there anything other than Erickson that we could look at that some appellate court has said, this is a good way, this is an acceptable way of trying these kinds of cases involving RAND? Not that I know of. So we're going to have to make that as a first decision. Right, although if I were in your situation, what I would do is look at exactly how the district judge handled this because he was very careful not to allow the jury to be too much influenced by his particular findings. And indeed, I think if there are any analogs to this, and as I said before, I think they come out of collateral estoppel, where you have findings from one proceeding that you incorporate in. He was careful with the witnesses, and he did do that. That's true. But if they had an objection, then we have to decide, unless your consent argument flies, we're going to have to decide whether he was right on the objection. I don't disagree with that. But what I'm suggesting, though, is that I think he was absolutely right because he has a situation where he's undeniably got to put the rate in front of the jury, and he's trying to do it in a way that is as unprejudicial as possible in the face of, and I can shift on the fly here in some respects, what was the evidence of the bad faith in this particular case. And Ms. Sullivan does a very nice job of trying to segregate out and say, well, this one by itself isn't bad. This one by itself isn't bad. But the reality is we're talking about a situation where we know that at the time this outrageous demand is made, they're already preparing to go to court to seek injunctive relief. They make a demand that is so far beyond commercially reasonable that nothing similar to this exists in any other situation. Nobody's ever seen a — That they in fact had made the same demand to other people and actually gotten paid. No. They never made a demand of 2.25 percent on the ultimate product, which is vast. I mean, that just takes us to a different dimension in terms of the approach. And candidly, the entire purpose of this exercise is to avoid holdup. So, I mean, to me at least, Motorola's position here is much like a loan shark finding somebody to whom he's loaned money, $20, and say, I've got a gun, I want $100. And the expectation is that the person who's got a gun on him is going to say, well, let's talk. I mean, that's just not what happens. This was a holdup effort. You happen to be representing Microsoft. I won't dispute that, Your Honor. But the entirety of this — the entire concept here is holdup. Where does that come from? It comes from the metaphor I just used. And if you put it in context, it's absolutely right, because what is the effect of an injunction that prevents the sale of Windows and Xbox on a worldwide basis potentially? I mean, that is all but a death penalty to Microsoft's business. Well, the issue is whether or not that's substantial facts for the jury to make the finding. Absolutely. And so the issue isn't whether or not how the discussion went. Is there sufficient facts for a jury to be able to make that finding that there was bad faith? Right. And I would submit to you that the facts that I just articulated, which is that this was preplanned, that they went and sought injunctive relief both in the United States and in Germany, that the offers were wildly beyond anything anybody could imagine, all are more than enough evidence to demonstrate that there was bad faith in this case. And it's worth at least a second to remember that the jury instruction here said that it had to violate community standards of decency, fairness, and reasonableness. And I haven't heard anything today about the jury instruction. Candidly, the jury instruction in this on good faith and fair dealing was, if anything, favorable to the plaintiff's — or to the defendant, because what it said was any single factor, if they found in favor of the defendant, would have been a basis on which to find good faith. So I don't know what it is that they're complaining on that. And, in fact, she doesn't raise that here today. What she argues is specifically that there wasn't enough evidence. And I submit to you that she's — What about the damages issues? I'm sorry? The damages issues? And on the damages issues, the question — I mean, the notion that Noehr-Pennington is any kind of an impediment seems to me a real stretch, because what's the basis of the agreement here? It is an agreement to forego seeking injunctive relief as long as a party is willing to accept on a RAND basis. That's the — Well, let's assume — we've never actually decided, and the district judge did — we've never decided. The district judge didn't take the position that — didn't quite take that position. I mean, he took the position that there wasn't a rule against an injunction, so in general, but there could be under particular circumstances. So I understand the argument to be that when you don't have a — or let me articulate a version. When you don't have a clear rule saying you can't bring an injunctive action, but you can bring an injunctive action in certain circumstances but not others, and even if this is the others and you can't bring it, it still should be protected activity that you can't get damages for. Right. But if the whole purpose of the contract was to prevent litigation and particularly to prevent the use of abusive injunctive relief and to ensure that everybody accepts RAND and proceeds forth under those circumstances, then it seems to me that if your bad faith actions force us to pay expenses in litigation, then those expenses, candidly, and worse, have to relocate from one location to another. Those costs flow directly. But there seems to me a more fundamental issue. Just to be clear, then, unlike what I was suggesting before, you are regarding this as equivalent to whether the case, whether they were seeking damages in this case, i.e., it doesn't matter that it was a — No, no, no, no. Of course not. We're not seeking our attorneys' fees for this particular case. All we're — they're too — I know you're not, but you're analyzing it as if you were, as I understand it. No, because we brought this case. This is our litigation. We brought this as a contract action. They brought the litigation in Germany, and they brought it in bad faith, and that's the findings of the jury — that's the specific finding of the jury, and the damages of both relocation costs and fees. And you couldn't have gotten bad faith damages in that case — bad faith fees in that case because Germany thought it was a perfectly good suit because they have different rules. Right. But that's — but that goes to whether there's a sham exception. I don't even think you'd get to nowhere, Pennington, because the notion that there's a right to petition the German government as a First Amendment-protected activity strikes me as beyond passing strange. And indeed, if there were a protected right to petition the German government, I don't know how that wouldn't — how this Court's previous affirmance of the injunction wouldn't have been a prior restraint on that First Amendment-protected right. And I didn't hear a peep from Motorola with respect to that issue when the — when the question came up the last time we were before this Court. So it seems to me pretty clear that this is not a First Amendment problem. This is a — this is a matter that they contracted away, and the damages that flow from the breach of that contract are — are, frankly, direct and unassailable. What about the question Judge Wallace raised, i.e., should we be certifying the question to the Washington Supreme Court? I'm sorry. I didn't hear that. Certification. Should we be certifying the attorneys' fees part of this to the Washington Supreme Court? I mean, I don't have any objection to that. It seems to me it is a pretty small piece of this. I believe, frankly, Judge Robart's in a much better position to evaluate that. But — but I do think, Judge Berzon, you're absolutely right about the better way to look at this. This is — this is not a fee-shifting, American rule kind of a problem. This is a breach that flows directly from bad faith violation of the contract. And that, to me, is the better way to think about it rather than worrying about whether there's an equitable exception to the American rule that applies in this context. I know that's the way Judge Robart analyzed it, but I think you can affirm it on the alternative ground without having to worry about that aspect of — of state law. Sort of like a malicious prosecution case. I'm sorry? Kind of like a malicious prosecution. It would be very similar to that kind of a theory. Again, it's bad faith violation of the good faith duty under the contract. Was there a general verdict in this case? Or do you have — No, we — well, there is — there are some specifics. With respect to the damages, they are tied directly to the — to the bad faith effort to get an injunction. Was there a specific finding of the jury on bad faith? With respect — yes, there was. And you would agree that all the damages flow from the injunctive activities? Yes, Your Honor. And not from the initial Randolph? Right. Right. I mean, you could make an argument that they actually flow from the failure to grant a Candidly, if we'd had a license, that would have solved the problem in Germany, and we couldn't get a license. But the reality is the way the jury — the way it was submitted to the jury and the way the jury analyzed it, it flows from the injunction. Is that of any pertinence to the question whether the introduction of the facts — underlying facts on the Rand rate issue was pertinent to the ultimate judgment? I.e., is there a harmlessness argument with regard to any 7th Amendment concerns that might be raised? Well, I think the answer would be yes, because, one, the judge said that the determination of — his determinations with respect to Rand and presumably all the subsidiary elements of it don't tell the jury what to decide. And candidly, what we know is that the injunction was entered into — was sought in bad faith, and it's in the context of a course of conduct, as you said yourself, Judge Motorola acted completely in bad faith. I'm saying that I said it could have, but that — you have to look at the whole thing, but yes. Right. I understand that. If there are no further questions, Your Honors, I'd ask the Court to affirm the judgment below. Okay. Thank you. Thank you. We'll put 10 minutes on the clock. Thank you, Your Honor. I'd like to pick up with Judge Wallace — Judge Wallace's question about what's the right way to do this. And the simple answer, Your Honor, is Rand issues should be addressed in patent infringement actions. Microsoft could have brought its Rand defenses in our patent infringement actions, and if there was a breach of our standard essential patents, but they only get — we only get Rand fees, right, Rand license fees, a jury could determine what fees we get. That's how things were done in D-Link Erickson, and D-Link Erickson, the but you do it through jury instructions on patent damages in a patent damages case. That's where Rand should be decided. Microsoft has tried to, in a sense, hijack the patent damages system, and by taking this into a state contract action. This is just a patent damages case upside down. Doesn't relying on that give you a problem when Erickson itself affirmed, applauded what the district judge did in this particular case? Well, Your Honor, I respectfully request that you go back and look at exactly how the Federal Circuit treated this case. And it did not — with respect, it did not applaud or criticize. It simply neutrally reported the fact in the footnote that this case had raised Rand. It also mentioned Realtek and Innovatio. And it didn't comment one way or the other. In fact, the Federal Circuit explicitly said it made no comment on the merits of this case. So, Your Honor, it didn't applaud it. And to the — The process, not the — they talked about the process. Your Honor, it didn't applaud it. It simply said those cases may come up, and they didn't express any comment. It's in the long footnote. But, Your Honor, that — let me go — I wasn't thinking of the footnote. I was thinking of the text. At which page, Your Honor? Where, on page 50 of the one I have, it said, Microsoft decision by Judge Robart. Well, Your Honor, here's what I would suggest about that. I think that the Federal Circuit is neither approving nor disapproving. Clearly, that was a patent infringement case.  And I asked you a question, how do we deal with RAND? The answer is, we can deal with it through patent infringement actions in which we figure out how to instruct on patent damages. And because the Court turns this into a patent damages case through the RAND order, there's a serious question whether jurisdiction lies with the Federal Circuit. But this case was a different case. It was a breach of a contract and a breach of the duty of fair — That's right, Your Honor. Good faith and fair dealing. And the damages that they sought and got were not damages they could have gotten in the case that you're describing. That's right, Your Honor. Except they could have sought their attorney's fees under Section 285. But, Your Honor, let's go back to the contract case. So I don't understand when you're saying this is all spinach. It's all the same thing. It's not all the same thing. It's different, Your Honor. It's a different thing. But what I'm suggesting is that the patent infringement action gives companies in the position of Microsoft ample opportunity to bring their RAND defenses. Actually, what Microsoft should have done is it should have said back to Motorola if it didn't like the opening letter, we won't pay 2.25 percent. We'll pay the H.264 pool rate or we'll pay some other rate. But they didn't write back. And that's why this is a bogus breach of contract case. It's a case in which there wasn't even a counteroffer. But, Your Honor — But to this day, Motorola has not accepted that rate or any rate, a much higher rate, that the judge found, which was considerably higher, as I understand it, than the pool rate. Well, Your Honor, during the pendency of this appeal, we have not accepted that rate, of course. We're trying to get — what we're trying to do is get back to a situation where the errors in the trial are eliminated, and then we can go back to the table where we should have been in the first place. But, Your Honor, the key question is on the scope of the consent, because I think it's become clear that if the — if we didn't waive our Seventh Amendment rights, this all should have been done before a jury. And I want to highlight what was wrong with introducing the RAND findings into the jury trial. We object to the RAND rate and range findings on all the grounds that are covered in our brief. It's speculative. It relies on pool rates that are not comparable. The district court himself admits in the long equation at ER 1621 to 23 that neither party suggested, that he doesn't have evidence for how Motorola would have valued its patents, that he's extrapolating from a blog post on page ER 1613, a blog post that Microsoft thinks it gets two times the value from the pool than it puts into the pool. And it then says, well, if Microsoft thought that, then Google would have thought the same, and we can attribute Google's actions to Motorola. None of that has any bearing on what Motorola thought in 2010, two years before it was acquired by Google. So with respect, had this expert opinion — had the findings in footnote 23 come in as expert opinion, there would have been serious grounds for a Daubert argument that they weren't based — that they were too speculative, they weren't based on evidence in record, and that they should have been excluded. But the core problem here is we never had the chance to do that because they come in as undisputable findings of fact. Kagan. What about the answer to Judge Wallace's question about whether there was an objection at trial or that covered the trial? At the jury trial? Yes. Profoundly yes, Your Honor. My friend is quite wrong that we didn't object at trial. We strenuously objected. We made a motion in limine. It's ECF 795. It's reprinted in — our motion in limine is reprinted in the excerpts at ER 630. To do what? The motion in limine wants to do what? The Court should preclude the introduction into evidence of the April 19, 2013, order determining RAND rates and ranges. We wanted to exclude the order, and we wanted to exclude use of the order. What was the point of the RAND trial then, the bench trial? Well, Your Honor, we don't think it should have been held as a separate trial. You can't say — But I think on this record, you certainly — I don't see a single objection to that procedure that's clearly made. Now, but we can look at that. But, I mean, you're — I guess I don't understand what's having — if you — assuming hypothetically that you agree to this procedure, and I know you don't, then what was the point of the RAND trial? Well, Your Honor, we didn't agree to this procedure. And let me try to state it more succinctly than I did before. We agreed that the Court could set the terms of a license. The Court later abandoned the quest to set the terms of the license because this judge was unobserved. Well, in part, in part. But it did find the RAND rate. But he changed the basis on which he was finding the RAND rate. He said, I'm not going to set a license. I'm going to change — I now think it's necessary for the fact finder to know the true RAND rate in order for us to decide breach. That is a change of litigation parameters. We're no longer setting a license, which is all we could have conceivably agreed to. We never agreed to him setting a rate in a vacuum. And we never agreed to him then saying that you can take that rate I set in a vacuum and the jury has to be told it is the rate and they can compare it to the license offer, the rate in the vacuum. That set us up for a breach finding. And we never consented to that, Your Honor. And if I could just give you a few other things to look at to show that we did object to this procedure, if I could just focus you on ER-993 and ER-996. That's our July 18, 2012, motion for partial summary judgment. Remember, in the summer of 2012, we're doing two things. We file a motion for partial summary judgment to stop this procedure. It's denied. And we come to you for relief from the anti-suit injunction. We never agreed to a procedure where we would just all get together and set the terms of the license. We were trying — and, in fact, in our litigation before you before, we strenuously argued to you that this was not the correct procedure. So, Your Honor, we casually agreed to something that never happened, setting the terms of the license. That can't be a Seventh Amendment waiver of our right to exclude the RAND order from the jury trial. But you did ask the Court to determine the RAND rate post-trial if the jury found breach. True. Only if it was setting a license. The consent was only ever to the set of the license. I don't see that language. I don't see the language in this. What page are you looking at, Your Honor? I'm looking at the — I don't have the ER, but I have the order. So I'm looking at the last two pages. Of the order, the order at 10110? I'm sorry, not the order. Your brief. In our brief. Yeah. Yeah. Exactly, Your Honor. We — at that point, we were still willing to have the judge set the rate if there was going to be a license. But what happened was backwards, Your Honor. It's important. The sequence is important. To the extent we ever agreed if there's a breach and the remedy is specific performance, then the judge can set the term of the contract that must be specifically performed. If we agreed to that, it does not mean that we agreed that the judge can determine a rate in a vacuum. It becomes like an uncrossable, unexcludable, absolute determinative expert opinion. It comes into the jury trial. And the jury hears — Doesn't the material on 993996 that you mentioned before, which I just looked at, seems to me to confirm my reading of the — or a reading of the hearing, which was, I guess, the same time, which is that your objection was to him — it was a substantive objection at that point. You never reneged on the notion that if there was going to be a determination of the RAND rate, it was going to be by the judge. Did you ever renege on that? We did not, Your Honor, with respect to a license. We did object to the judge setting a RAND rate to tell the jury how to determine  But what's the relevance of 993996, which is such a substantive discussion of the notion that he couldn't set the license rate because there wasn't a sufficient contract for him to infer the rate? That's what the argument is. But it wasn't an argument that if he's going to do it, he shouldn't — that it should be done by the jury. Did you ever argue that? That the rate should be set by the jury? Yes. And no, we did not. But we did argue that the rate should not be set in a vacuum, and we did argue that the rate set in a vacuum should not be instructed to the jury as an inarguable  The jury trial here, Your Honor, if you look at pages like ER 384, and you see that witnesses — that's Microsoft's expert witness being allowed to read into the transcript the supposed undisputed fact that Motorola contributed only a sliver to the technology and the standard, and its patents were only of minor importance. First of all, those findings are far beyond the scope of any consent. But second of all, they inevitably bias the jury into thinking that the delta between the opening offer and the true RAND rate that was now an undisputed fact was evidence of bad faith. And, Your Honor, we never consented to this sequence. We never consented to this procedure. We never consented to find the RAND rate, the true RAND rate first, and then tell the jury that's the absolute true RAND rate. We don't think there's anything — any such thing as a true RAND rate. In the real world, these are set in cross licenses. Kagan. Well, if you agreed to — let's assume, and I think this is what Judge Thomas asked you before, if you agreed, and assuming you agreed, to have the RAND rate trial and have the judge decide the RAND rate and to do it first, okay, then whether you agreed to it or not, isn't it a collateral stop or a law of the case, even if you didn't agree to it? Your Honor, I'm not sure of the question. The question is, with — do you need — did you need to consent to the introduction to the jury trial, if you consented, to there being a bifurcated trial and to the judge deciding the RAND rate, and then there is a determination of the RAND rate? And do you need to consent to taking it from here and putting it in there when it is the law of the case that this is the RAND rate? Your Honor, we believe, yes, we do need to have consented to the introduction and to the jury trial, and we did not. And the — because the scope of our consent, the Seventh Amendment — But why? Why if you consented to the first piece of it? I understand you say you didn't, but let's assume you did. We didn't. We didn't. Then do you need any further consent? Yes. There needed to be further consent to the introduction of these findings into the jury trial. We never consented — we're going in a little bit of circles. We never consented to this sequence. We never consented to the bifurcation. We never consented to the setting of a RAND rate in a vacuum. The most we ever consented to was the judge's determination of a rate as part of a remedy for specific performance after the jury found breach. And when the whole case flipped the other way around, we were put to a jury trial that was, in a sense, it was a setup. The RAND rate comes in. There's a big delta between the RAND rate that the judges determined. We are not allowed to dispute the RAND rates. Our own witnesses can't even say what was in their mind at the time, because the judge at page ER-257 instructs, pay no — in a sense, pay no attention to what he thought about the RIM license or any other historical license. I have told you what the RAND rate is. And that cautionary instruction tells you at 257 or at 384, when you look at what happened at the jury trial, in a sense, the district court's findings of fact become a kind of expert opinion that can't be excluded, it can't be crossed, it can't be in context of other evidence, and that bias, the breach finding, Your Honor. So if I do nothing else today, I ask you to separate two things. A license case that never happened. Two years ago, we thought it might happen. We thought maybe there would be a nice, happy RAND case in which a license was set and the judge set the term as a remedy for a breach after a breach was found. We never got the fair breach trial that — so we never got to specific performance and they never amended to even ask for a license or specific performance. What happened is the world was turned upside down, the RAND trial was held first, and the rate became something that determined the breach trial against us. And we're socked with $15 million in breach damages we never should have been subject to. So, Your Honor, whatever should have happened in a counterfactual world where the license was at issue, it didn't happen here. The $15 million should be reversed or vacated or it should be sent back for a new trial, unless you want to send us to the Federal Circuit to figure this all out. Thank you, Your Honor. Thank you, counsel. Thank you both for your arguments. And I want to thank both of you for your long contributions to the Ninth Circuit. We appreciate that very much. We'll be in recess. Thank you.
judges: Thomas, Wallace, Berzon